# Exhibit A

eFiled
08/17/2023 5:48:29 PM
Superior Court
of the District of Columbia

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| TRAVELERS UNITED, INC.<br>2833 Alabama Ave SE #30736<br>Washington, D.C. 20020, on behalf of itself<br>and the putative classes,<br><br>Plaintiff,<br><br>v.<br><br>HYATT HOTELS CORPORATION<br>251 Little Falls Drive<br>Wilmington, DE 19808,<br><br>HYATT CORPORATION<br>1090 Vermont Ave, NW<br>Washington, D.C. 20005 and,<br><br>HYATT FRANCHISING, LLC<br>251 Little Falls Drive<br>Wilmington, DE 19808<br><br>Defendants. | Case No:    2023-CAB-005095<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.     Since at least 2020, Hyatt[1] has been systemically cheating consumers out of tens, if not hundreds, of millions of dollars each year by falsely advertising its hotel room rates.

2.     Rather than disclosing the full cost of its hotel rooms upfront, Hyatt instead adds on last-minute "destination fees," "resort fees" and other similar charges that are really part of the daily room rate.

3.     The goal of Hyatt's false advertising is to convince consumers shopping for a hotel room that a Hyatt room is cheaper than it is.

---

[1] Defendants Hyatt Hotels Corporation, Hyatt Corporation, and Hyatt Franchising, LLC are referred to herein, collectively, as "Hyatt" and refers to hotels that Hyatt owns or franchises.

4.    These fees—commonly called "Junk Fees" (defined by the Federal Trade Commission ("FTC") as "unfair or deceptive fees that are charged for goods or services that have little or no added value to the consumer" or fees that are "hidden," such as those disclosed only at a later stage in the consumer's purchasing process or not at all")[2]—have recently been the subject of national media attention, including during President Biden's 2023 State of the Union Address.

5.    As President Biden explained, "too many companies" are charging "hidden surcharges . . . to make you pay more. . . . [J]unk fees may not matter to the very wealthy, but they matter to most other folks in homes like the one I grew up in, like many of you did. They add up to hundreds of dollars a month. They make it harder for you to pay your bills[.]"[3]

6.    Indeed, in 2017 alone, the Junk Fee revenue of the U.S hotel industry was approximately $2.7 billion.[4]

7.    Junk Fee practices—like Hyatt's—are not just greedy and deceptive. They are illegal.

8.    Junk Fees violate the District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28–3901, *et seq.*, ("CPPA"), which *requires* business to sell goods and services for their advertised prices.

9.    Travelers United brings this action under the CPPA to stop Hyatt from falsely advertising hotel room rates in the District of Columbia (the "District") and to residents of the

---

[2] *Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011*, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (to be codified at 16 C.F.R. pt. 464), *available at* https://www.federalregister.gov/documents/2022/11/08/2022-24326/unfair-or-deceptive-fees-trade-regulation-rule-commission-matter-no-r207011 (cleaned up).

[3] *President Biden's State of the Union Address*, White House, https://www.whitehouse.gov/state-of-the-union-2023/ (last visited Aug. 9, 2023).

[4] Shelle Santana, Steven K. Dallas, & Vicki G. Morwitz, *Consumer Reactions to Drip Pricing*, Mkting. Science (forthcoming), at 4, *available at* https://www0.gsb.columbia.edu/mygsb/faculty/research/pubfiles/26100/Santana%20Dallas%20Morwitz%20Marketing%20Science%20forthcoming.pdf.

District and force Hyatt to pay back the tens of millions of dollars in unlawful Junk Fee revenues it has taken from consumers together with statutory penalties and punitive damages.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over the subject matter of this case pursuant to D.C. Code § 11-921 and D.C. Code § 28–3905(k)(2).

11.    This Court has personal jurisdiction over the defendants pursuant to D.C. Code § 13- 423(a).

## PARTIES

**A.    Travelers United**

12.    Plaintiff Travelers United, Inc., is a nonprofit public interest organization. Travelers United is a Delaware exempt corporation which is registered as a foreign corporation in the District of Columbia. Travelers United is based in Washington, D.C. and Virginia.

13.    The mission of Travelers United is to improve and enhance travel for consumers. Travelers United has been instrumental in advocating against hidden hotel fees both federally and locally in the District.

14.    Travelers United has met with many members of the D.C. Council and their staff regarding the issue of the hotel Junk Fees. Nationally, Travelers United has worked and met with members of Congress, the National Association of Attorneys General, other national consumer advocacy groups, and the Federal Trade Commission educating, alerting, and advocating against hidden hotel Junk Fees.

15.    Travelers United has standing to bring its claims under D.C. Code § 28–3905(k)(1)(D)(i) because it qualifies as a public interest organization with a sufficient nexus to the consumer interests at issue in the litigation.

**B.    Hyatt**

16.    Defendant Hyatt Hotels Corporation is a multinational hospitality company that owns, manages, and franchises a broad portfolio of hotels and lodging facilities throughout the

United States and abroad, including in the District of Columbia. It is a Delaware corporation that is headquartered in Chicago, Illinois.

17.     Defendant Hyatt Corporation is a subsidiary of Hyatt Hotels Corporation. It is a Delaware corporation, is headquartered in Chicago, Illinois, and operates nationally, including in the District of Columbia.

18.     Defendant Hyatt Franchising, LLC is a subsidiary of Hyatt Hotels Corporation. It is a Delaware limited liability company, is headquartered in Chicago, Illinois, and operates nationally, including in the District of Columbia.

19.     Hyatt (defined above, *supra* note 1) has, at all relevant times, engaged in trade or commerce in the District by advertising, offering, and providing hotel lodging to District customers in its hotels in the District and outside of the District.

## FACTUAL BACKGROUND

### A.     Companies Use Junk Fees to Trick Consumers.

20.     Large, sophisticated companies—like Hyatt—with large, sophisticated marketing departments know that Junk Fees trick consumers into paying more for a good or service than they otherwise would.

21.     Indeed, in 2017 alone, the Junk Fee revenue of the U.S hotel industry was approximately $2.7 billion.[5]

22.     Two common types of Junk Fees practices are "drip pricing" and "partitioned pricing," both of which are used by Hyatt to illicitly generate tens, if not hundreds, of millions of dollars in extra (and unearned) profits each year.

23.     **Drip Pricing:** Drip pricing occurs when a company does not disclose the total price of a product or service until late in the purchase process, after consumers have already expended time and effort selecting the product or service and have already committed to a particular purchase.

---

[5] Santana et al., *Consumer Reactions to Drip Pricing*, *supra* note 4, at 4.

24.     Consumers who are not provided the complete price until checkout are likely to proceed with their purchase even if continuing to search for a cheaper price would be more "optimal" for them because consumers want to avoid "the cost of the time and cognitive effort involved" in continuing to search for a product or service.[6]

25.     Once a consumer decides what to buy, he is unlikely to depart from that decision because of the "additional cognitive effort" involved in resuming his search.[7] In other words, omitting Junk Fees from the advertised cost of a product or service through drip pricing induces consumers to pay a higher total price than they otherwise would have.

26.     **Partitioned Pricing:** Partitioned pricing occurs where a portion of the costs for a good or service is excluded from the total price. When Junk Fees are initially "partitioned" from total price, consumers are unable to make effective price comparisons between goods and service leading to distortions in the market. In other words, partitioning Junk Fees make consumers less likely to be able to effectively select "the most valuable option"[8] when making a purchase.

27.     Making matters worse, consumers exposed to advertising which partitions, or separates, Junk Fees from total price are also more likely to underestimate the total price of a given product or service,[9] meaning they are further impeded from comparing their options.

28.     These drip pricing and partitioned Junk Fee practices are not innocuous. When a Junk Fee is hidden and/or partitioned, consumers cannot reasonably compare the cost of a product or service across available options within a company or across companies.

---

[6] Mary W. Sullivan, *Economic Issues: Economic Analysis of Hotel Resort Fees*, Bureau of Economics Fed. Trade Comm'n (Jan. 2017), at 16-17, https://www.ftc.gov/system/files/documents/reports/economic-analysis-hotel-resort-fees/p115503_hotel_resort_fees_economic_issues_paper.pdf.

[7] *Id.* at 17.

[8] *Id.* at 23; David Adam Friedman, *Regulating Drip Pricing*, 31 Stan. L. & Pol'y Rev. 51, 68 (2020) (Lan Xia and Kent Monroe experiments showed that "price separation may enhance consumers' . . . perceived value . . . and reduce further information search intentions" due to "insufficient price adjustment" (quoting Lan Xia & Kent Monroe, *Price Partitioning on the Internet*, 18 J. Interactive Mktg. 63 (2004)) (cleaned up)).

[9] Sullivan, *Economic Issues: Economic Analysis of Hotel Resort Fees*, *supra* note 6, at 22.

29.     Indeed, as the companies that engage in Junk Fee practices are well aware, consumers choose a product or service based on the advertised "base price," and not based on the drip price or partitioned price, especially when the Junk Fee is not adequately disclosed.[10]

30.     Accordingly, "buyers may be hurt" because "[w]hen there is uncertainty over possible drip sizes . . . consumers more frequently fail to identify the cheapest offer." Rasch et al. *Drip pricing and its regulation: Experimental evidence*, *supra* note 10; *see, e.g.*, Santana et al., *Consumer Reactions to Drip Pricing*, *supra* note 4, at 6 (studies showed that "consumers exposed to drip pricing . . . are significantly more likely to 1) initially select the option with the lower base price, 2) make a financial mistake by ultimately selecting the option that has a higher total price than the alternative option, given the add-ons chosen, and 3) be relatively dissatisfied with their choice").

31.     As the FTC's Bureau of Economics has explained, the use of resort fees adds steps to the process of determining the actual price of a hotel room, which forces consumers to pay more than they would if presented with full, complete prices:

> With the separate disclosure of resort fees, searching for hotel accommodations on hotel websites requires more steps than if resort fees were included in the room rate. If resort fees were included in the room rate, consumers could compare rooms at different hotels by simply viewing the room pages at the hotel websites and remembering the prices. With separately-disclosed resort fees, consumers would need to add the room rate to the resort fee and remember the total for each hotel under consideration or keep track of the room rates and resort fees separately for each hotel. Alternatively, the consumer could click through to the booking page for

---

[10] Alexander Rasch et al. *Drip pricing and its regulation: Experimental evidence*, 176 J. Econ. Behavior & Org. 353 (2020), *available at* https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189 ("buyers . . . . based their purchase decision exclusively on the base price"); *see also* Jane L. Levere, *Paying a 'Resort Fee' When You're Not at a Resort*, N.Y. Times (Oct. 22, 2018), https://www.nytimes.com/2018/10/22/business/luxury-hotels-urban-areas-cities.html (according to Robert Mandelbaum, director of research information services for CBRE Hotels' Americas Research, "Resort fees are a very profitable way for hotels to raise revenue and not advertise they're raising room rates. By a strict definition, they're not raising room rates but adding a mandatory fee").

each hotel to view the total charges for the trip and remember the total.[11]

32.    As a result, consumers are forced either to "incur higher total search and cognitive costs or to make an incomplete, less informed decision that may result in a more costly room, or both."[12]

33.    The FTC has thus characterized Junk Fees as especially egregious when they are hidden (*i.e.*, "disclosed only at a later stage in the consumer's purchasing process or not at all"), because openly disclosed Junk Fees would enable consumers to determine that the cost of a given product or service is not favorable relative to the cost charged by competitors and choose to do business elsewhere. *See, e.g.*, *Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011*, *supra* note 2 ("After a market leader took unilateral action to phase out hidden fees, the platform 'lost significant market share and abandoned the policy after a year because consumers perceived the platform's advertised prices to be higher than its competitors' displayed prices.'" (citation omitted)).

34.    Moreover, drip and/or partitioned pricing runs afoul of the FTC Act itself. *See* 15 U.S.C. § 45(a)(1) (declaring unlawful "unfair or deceptive acts or practices in or affecting commerce"). The FTC's guidance on bait and switch advertising states that "[n]o statement . . . should be used in any advertisement which creates a false impression of the . . . value . . . of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, the purchaser may be switched from the advertised product to another." 16 C.F.R. § 238.2(a). If the first contact is secured by the deceptive bait advertisement, it is a violation of law even if the true facts are subsequently made known to the buyer. 16 C.F.R. § 238.2(b). Through drip and/or partitioned pricing, companies induce consumers to choose a

---

[11] Sullivan, *Economic Issues: Economic Analysis of Hotel Resort Fees*, *supra* note 6, at 2-3.

[12] *Id.* at 4; *see also* Friedman, *Regulating Drip Pricing*, *supra* note 8, at 67 (". . . sellers provide buyers with the 'initial value' in the form of the initially-presented base price. . . . Buyers are influenced by the initial value, so a lower base price would create the impression of a lower overall price." (citing Gorkan Ahmetoglu et al., *Pricing Practices: A Critical Review of their Effects on Consumer Perceptions and Behaviour*, 21 J. Retailing & Cons. Services 696, 697 (2014))).

product or service based on an advertised price (*i.e.*, the "bait"), despite ultimately charging a different and higher price than advertised (the "switch").

35.    Given this, it is no surprise companies are motivated to hide Junk Fees through drip and/or partitioned pricing for as long as possible in the search and purchase process, as duping consumers into paying Junk Fees brings in substantial revenue. In 2017 alone, the Junk Fee revenue of the U.S. airline and U.S hotel industries was approximately $57 billion and $2.7 billion, respectively.[13]

36.    In many instances, companies even compound the benefit they obtain through these practices by increasing Junk Fees at a higher rate than they increase the base price of the underlying product or service itself.[14] As a result, the product or service appears cheaper to consumers than competitor products or services, even though the total cost of the product or service, inclusive of Junk Fees, is equally if not more expensive than those other companies' products or services.[15]

37.    Companies are also able to increase hidden Junk Fees without suffering meaningful market consequences.[16] In particular, companies are free to charge excessive Junk Fees in part because drip pricing impedes fair, honest, and free market competition as they are not adequately disclosed alongside the base price.[17]

38.    Hence, through drip and/or partitioned pricing, companies can charge excessive Junk Fees while skirting economic consequences, as shrouding the fee avoids deterring consumers from purchasing a given product or service based on a Junk Fee and its effect on the total price.

39.    Meanwhile, competitor companies and consumers face the consequences. Companies that engage in drip and/or partitioned pricing will lure consumers away from properly

---

[13] Santana et al., *Consumer Reactions to Drip Pricing*, *supra* note 4, at 4.

[14] *Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011*, *supra* note 2.

[15] *See id.*

[16] Rasch et al. *Drip pricing and its regulation: Experimental evidence*, *supra* note 10.

[17] *Id.* ("firms fiercely compete in base prices but not in drip prices," so "total price increases when firms use drip pricing").

behaving competitors that do not engage in such practices (and thus appear to charge higher prices) and will earn more profit than those competitors.[18]

40.    Junk Fees charged through drip and/or partitioned pricing also generate significant burden for individual consumers. *See Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011*, *supra* note 2 (explaining that "[c]onsumers faced with such fees pay upward of twenty percent more than when the actual price was disclosed upfront," and, as a result, such fees "impose substantial economic harms on consumers").

**B.    The FTC and State Attorneys General Are Turning Off the Faucet on Hotel Drip Pricing.**

41.    In November 2012, the FTC warned the hotel industry that drip pricing as it pertains to charging resort fees may violate federal consumer protection law by "misrepresenting the price consumers can expect to pay for their hotel rooms."[19] The FTC specifically warned the hotels that the largest and most prominent price for a hotel room should include the resort fee, and should be provided to the consumer upfront and not later in the checkout process, to avoid constituting hotel Junk Fee drip pricing.[20] These fees are required to be revealed in the advertised room rate, not later in the checkout process or even later when the consumer checks into the hotel.[21]

42.    The FTC's Bureau of Economics then issued a report in 2017 confirming its concerns about this practice of drip pricing. That report concluded that "consumers are likely being

---

[18] *Id.* (". . . where there is uncertainty about the drip size, sellers with a high drip-price limit can earn profits above the competitive level.").

[19] Warning Letter from Mary K. Engle, Assoc. Dir. for Advert. Pracs., Fed. Trade Comm'n (Nov. 2012), *available at* https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-warns-hotel-operators-price-quotes-exclude-resort-fees-other-mandatory-surcharges-may-be/121128hoteloperatorsletter.pdf; *see also FTC Warns Hotel Operators that Price Quotes that Exclude 'Resort Fees' and Other Mandatory Surcharges May Be Deceptive*, Fed. Trade Comm'n (Nov. 28, 2012), https://www.ftc.gov/news-events/news/press-releases/2012/11/ftc-warns-hotel-operators-price-quotes-exclude-resort-fees-other-mandatory-surcharges-may-be.

[20] Warning Letter from Mary K. Engle, *supra* note 19.

[21] *Id.*

harmed by the hotel industry practice of disclosing mandatory resort fees separate from posted room rates, without first disclosing the total price."[22]

43.     In sum, separating mandatory resort and other Junk Fees from advertised room rates without first disclosing the total price is likely to harm consumers by artificially increasing the search costs and the cognitive costs of finding and booking hotel accommodations. Unless the total price is disclosed upfront, consumers are not reasonably able to make an informed decision as to which product or service would be most favorable for them to purchase.

44.     Seeking to protect consumers from this harm, numerous Attorneys General have brought enforcement actions to put an end to Junk Fee practices in the hotel industry. For example, in 2019, the Attorney General for the District of Columbia filed a lawsuit against Marriott International, Inc. ("Marriott") under the CPPA "for hiding the true price of hotel rooms from consumers and charging hidden resort fees to increase profits."[23] Other Attorneys General have brought similar actions against hotel corporations for inducing consumers to effectuate purchases that are not cost effective, while the companies gain millions.[24]

---

[22] *FTC Economic Issue Paper Examines the Impact of Disclosing Mandatory Hotel Resort Fees Separately From Room Rates*, Fed. Trade Comm'n (Jan. 5, 2017), https://www.ftc.gov/news-events/news/press-releases/2017/01/ftc-economic-issue-paper-examines-impact-disclosing-mandatory-hotel-resort-fees-separately-room.

[23] *AG Racine Sues Marriott for Charging Deceptive Resort Fees and Misleading Tens of Thousands of District Consumers*, Office of the Att'y Gen. of D.C. (July 9, 2019), https://oag.dc.gov/release/ag-racine-sues-marriott-charging-deceptive-resort; Compl. for Violations of the Consumer Prot. Procedures Act, *District of Columbia v. Marriott Int'l, Inc.* (D.C. Super. Ct.), at 3 ¶¶ 4-5, *available at* https://oag.dc.gov/sites/default/files/2019-07/Marriott-Complaint.pdf (alleging "price deception" robs "consumers of the ability to readily ascertain and compare the actual price of a room at a Marriott hotel to the price of the hotel rooms offered by Marriott's competitors and at other Marriott hotels").

[24] *See, e.g.*, Amended Complaint for Injunctive and Other Relief, https://ago.nebraska.gov/sites/ago.nebraska.gov/files/doc/2019.07.24_Hilton%20Dopco%20Inc._Amended%20Complaint.pdf (Nebraska suit against Hilton for "drip pricing" whereby consumers are "misled or confused concerning the true cost of an overnight stay"); *AG Shapiro's Action Requires Marriot to Disclose "Resort Fees,"* Pa. Att'y Gen. Michelle A. Henry (Nov. 17, 2021), https://www.attorneygeneral.gov/taking-action/ag-shapiros-action-requires-marriott-to-disclose-resort-fees/ (Pennsylvania settlement with Marriott, whereby Marriott agreed "to prominently

45.     Despite the 2012 warning letter from the FTC, Attorney General enforcement actions, and, most importantly, the substantiated harms to consumers, Hyatt has until very recently continued to advertise room prices that do not include its resort and other Junk Fees.[25]

**C.     Hyatt's Deceptive Junk Fee Advertising**

46.     This action was commenced after years of Hyatt deceiving customers about the rates of its hotel rooms.

47.     Until very recently, Hyatt did not include Junk Fees in its advertised hotel room prices. By doing so, Hyatt was misrepresenting to, or concealing from, consumers the actual total cost for their stay.

48.     For instance, Hyatt's practice was to initially advertise a room rate that excludes Junk Fees, but then to add Junk Fees into the final charges a consumer was required to pay.

49.     Further, even when a consumer would select a hotel room on Hyatt.com, Hyatt still did not disclose the total nightly price to the consumer but would bifurcate Junk Fee charges from the room rate. Hence, even then a consumer could not reasonably compare the total price of a room against the price of other rooms at Hyatt and other hotel companies.

50.     Hyatt charged these additional Junk Fees, which can exceed $50 per day at Hyatt properties, to increase its revenues without appearing to raise the room rate at its hotels.

51.     When consumers searched for and sought to book a hotel using Hyatt's online reservation system, Hyatt provided the consumers with a quoted room rate and allowed guests to see the price, but there was no mention of an additional mandatory Junk Fee.

_____

disclose the total price of a hotel stay . . . on the first page of its booking website as part of the total room rate"); *Office of the Attorney General Sues Travel Reservation Site for Deceptive Trade Practices Regarding the True Price of Hotel Rooms*, Ken Paxton Att'y Gen. of Tex. (Aug. 10, 2023), https://www.texasattorneygeneral.gov/news/releases/office-attorney-general-sues-travel-reservation-site-deceptive-trade-practices-regarding-true-price (Texas suit against travel reservation company for "omitting mandatory fees from the advertised room rate").

[25] Upon information and belief, Hyatt began including Junk Fees in the advertised prices for its hotel rooms in or around August 2023.

52.     For example, when consumers would search for a hotel room in the District, the consumer would receive a variety of potential options with purported "Avg/Night" pricing information:



53.     The initial advertisement did not provide any indication as to whether a particular hotel was a "Junk Fee hotel," *i.e.*, a hotel engaging in drip and/or partitioned Junk Fee practices. Thus, for some hotels, the advertised Avg/Night price was correct.

54.     However, for Junk Fee hotels, the advertised Avg/Night price was not correct. When a consumer would navigate to book a room at a Junk Fee hotel, the transaction could not be completed for the advertised price.

55.     For example, as shown, the advertised average price for Grand Hyatt Washington was $248 per night.

56.     However, when the Grand Hyatt Washington was selected, the consumer would be confronted with a page that did not disclose a total price inclusive of Junk Fees, but instead partitioned the $20 destination fee from the room rate:



57.     Due to this partitioned pricing, consumers still could not reasonably compare the costs and benefits of a given Hyatt hotel room to other rooms available through Hyatt and at other companies.

58.     Finally, Hyatt would disclose the actual total price toward the end of the purchase. In the example below, the total price is $614.98 for two nights. This consists of the advertised price of $247.50 for each night ($495) and a per night destination fee of $22.99 ($45.98),[26] meaning that

---

[26] The total for the destination fee is $45.98 because this includes the nightly $20.00 charge for

the average and actual per night cost of the room is $270.49 prior to the addition of legitimate occupancy taxes assessed on the advertised price:



59.     Even then, however, a consumer was misled to believe that the change in price may have resulted from mandatory government charges (*i.e.*, "Taxes & Fees").

60.     The consumer would only see the individual components that comprised the "Taxes & Fees" after selecting certain text in order to see price details. Upon doing so, it turned out that a "destination fee" of $45.98 had been added to the transaction that was not associated with any mandatory government charge but would inure solely to the benefit of Hyatt and would be paid to and kept by Hyatt.

61.     A consumer had no way to reserve a hotel room with Hyatt without incurring this additional fee of $45.98 and, as a result, had no ability to complete the hotel reservation transactions for the advertised price of $248 per night.

62.     The same was true for transactions throughout the country for consumers based in the District who sought to book a room outside the District.

two nights plus taxes assessed on those fees at the D.C. transient accommodations rate. D.C. Code § 47-2002.2.

63.     For example, if a resident of the District attempted to book a hotel room in the Phoenix, Arizona area through Hyatt's website, she would receive the following options with nightly pricing information:



64.     Yet, when the consumer went to complete the transaction, she could not book a room at a Junk Fee hotel at the advertised price.

65.     For example, if a consumer from the District selected the Hyatt Regency Scottsdale Resort & Spa at Gainey Ranch with an advertised price of $319 per night, at checkout the consumer would ultimately be confronted with a total nightly rate of $415.03.

66.     Even then, a consumer was misled to believe that the change in price may have resulted from mandatory government charges (*i.e.*, "Taxes & Fees"). The consumer would only see that a "resort fee" of $51.31 that would be paid to and kept by Hyatt was added to the transaction after selecting certain text in order to see the price breakdown:



67.     A consumer had no way to reserve a hotel room with Hyatt without incurring a Junk Fee of $51.31 and, as a result, had no ability to complete the hotel reservation transaction for the advertised price of $319 per night.

68.     Further, even after a consumer would select a hotel room to book at Hyatt locations throughout the United States, Hyatt would partition any Junk Fee charges from the total price of the room until later in the checkout process, meaning consumers still could not reasonably compare the costs and benefits of a given Hyatt hotel room to other rooms available through Hyatt and at other companies.

69.     Hyatt's Junk Fees were also misleading because they were hidden in a section called "Taxes & Fees" when, in fact, they are not mandatory government charges but would inure solely to the benefit of Hyatt and Hyatt would retain the entire amount of the charge.

70.     This same practice not only affected consumers searching for and assessing hotels rooms based on a price in dollars or other currency, but also consumers who would search for room prices using World of Hyatt Points. In the latter scenario, the advertised price for a Junk Fee Hotel would disclose an amount of points without disclosing the Junk Fee a consumer would need to pay to book the room.

71.     Hyatt's deceptive Junk Fee advertising stands in stark contrast to the current practices of some of Hyatt's competitors and Hyatt itself, which in or around August 2023 finally started to advertise accurate pricing information to consumers looking to book a hotel room.

72.     Take for example, Hyatt's advertisement on August 17, 2023 to book a room at Grand Hyatt Washington for August 28-29, 2023. Unlike its practice for years, Hyatt now displays a complete price of $272 "Avg/Night" as the advertised price which it says *includes* a $20 "destination fee":



73.     From the onset of the search process, consumers on Hyatt today are thus able to compare accurate total price across hotels in order to make an informed choice as to which room and company is most cost effective for the particular consumer.

74.     Nevertheless, upon checkout, Hyatt continues to deceptively place the "destination fee" or other similar charge under the "Taxes & Fees" heading.

75.     Before approximately August 2023, Hyatt's consumers were not so fortunate. Hyatt's prior practices induced consumers to undertake the search and cognitive effort to pick a hotel or room. *Only then*, after the consumer had spent valuable time and effort and psychologically committed to a hotel, was the consumer appraised of the actual total price.

## THE DISTRICT'S CONSUMER PROTECTION PROCEDURES ACT

76.     The District of Columbia Consumer Protection Procedures Act protects consumers from a wide range of unfair and deceptive business practices. *See* D.C. Code § 28–3904.

77.     Consistent with these protections, CPPA Section 28–3901(c) directs courts to construe the CPPA broadly "to promote its purpose," including ensuring that "a just mechanism exists to remedy all improper trade practices" and promoting "through effective enforcement[] fair business practices throughout the community." D.C. Code §§ 28–3901(c), (b)(1), (2).

78.     Among other things, the CPPA "establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia," D.C. Code § 28–3901(c), and makes it unlawful to "advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered" and "make false or misleading representations of fact concerning . . . the price in comparison to [the] price of [a] competitor['s]," D.C. Code §§ 28–3904(h), (j).

79.     CPPA Section 28–3904 is explicit that a violation occurs regardless of "whether or not any consumer is in fact misled, deceived, or damaged" by the unlawful practice.

80.     Further, the CPPA authorizes public interest organizations, such as Travelers United, to bring claims on behalf of a class of consumers:

> [A] public interest organization may, on behalf of the interests of a consumer or a class of consumers, bring an action seeking relief from the use by any person of a trade practice in violation of a law of the District if the consumer or class could bring an action . . . .

D.C. Code §§ 28–3905(k)(1)(D).

81.     Where a violation is found, the CPPA provides for statutory damages of $1,500 *per violation*, among other relief. D.C. Code § 28–3905(k)(2)(A)(i).

82.     Under the CPPA, a nonprofit or public interest organization may also seek an injunction against the use of the unlawful trade practice. D.C. Code § 28–3905(k)(2)(D).

## CLASS ALLEGATIONS

83.     This action is brought and may properly proceed as a class action pursuant to D.C. Rule of Civil Procedure 23 ("Rule 23"), including Sections (b)(1), (b)(2) and (b)(3) of Rule 23.

84.    Travelers United seeks certification of the following nationwide class (the "**National Class**"), consisting of the following individuals:

All individuals in the United States who booked a room at a Hyatt hotel within the District of Columbia for personal use and paid a resort, destination, and/or other similar fee to Hyatt.

85.    Travelers United also seeks certification of the following District of Columbia class (the "**District Class**"), consisting of the following individuals:

All residents of the District of Columbia who booked a room at a Hyatt hotel within the United States for personal use and paid a resort, destination, and/or other similar fee to Hyatt.

86.    The National Class and District Class are collectively referred to as the "Classes," and their members are collectively referred to as the "Class members."

87.    Hyatt's deceptive Junk Fee practices violated each Class members' individual statutory right to truthful information from Hyatt about the actual price of nightly room rates purchased, leased, or received in the District of Columbia.

88.    Hyatt's deceptive Junk Fee practices have resulted in actual injury and harm to the Class members in the amount of the Junk Fees which were absent from the advertised price and which they paid as a result of Hyatt's drip and/or partitioned Junk Fee practices.

89.    Travelers United explicitly reserves its right to amend, add to, modify, and/or otherwise change the proposed class definitions as discovery in this action progresses.

90.    The following people are excluded from any of the Classes: (1) any Judge or Magistrate presiding over this action, members of their staffs (including judicial clerks), and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest, and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Travelers United's counsel and

Defendants' counsel, and non-attorney employees of their firms; and (6) the legal representatives, successors, and assigns of any such excluded persons.

91.    **Numerosity.** Travelers United is informed and believes that there are tens of thousands or potentially millions of members of the Classes. The Classes are so large that the joinder of all of their members is impracticable. The exact number of members of each of the Classes can be determined from information in the possession and control of Hyatt.

92.    **Commonality.** Hyatt has acted or refused to act on grounds that apply generally to the Classes. Absent certification of the Classes, the relief sought herein creates the possibility of inconsistent judgments and/or obligations imposed on Hyatt. Numerous common issues of fact and law exist, including, without limitation:

a.    Whether Hyatt's drip and/or partitioned Junk Fee practices are a trade practice under the CPPA;

b.    Whether hotel rooms are consumer goods or services under the CPPA;

c.    Whether Hyatt's offer, lease, and/or sale of hotel rooms renders it a merchant under the CPPA;

d.    Whether Hyatt's advertising, or causing of advertising by third parties, of prices and room rates for lodging in their hotels that do not include Junk Fees constitutes an advertisement or offer without the intent to sell the lodging as advertised, which is an unlawful trade practice that violates the CPPA (D.C. Code § 28–3904(h));

e.    Whether Hyatt's drip and/or partitioned Junk Fee practices constitute a "misrepresent[ation] as to a material fact which has a tendency to mislead" (D.C. Code § 28–3904(e));

f.    Whether Hyatt's drip and/or partitioned Junk Fee practices "fail to state a material fact" that "tends to mislead" (D.C. Code § 28–3904(f));

g.    Whether Hyatt's drip and/or partitioned Junk Fee practices "use innuendo or ambiguity as to a material fact, which has a tendency to mislead" (D.C. Code § 28–3904 (f-1));

h.     Whether Hyatt's drip and/or partitioned Junk Fee practices "make false or misleading representations of fact concerning . . . the price in comparison to price of competitors" (D.C. Code § 28–3904 (j)); and

i.     Whether Hyatt representing Junk Fees as among "Taxes & Fees" is an unlawful trade practice under the CPPA.

93.     **Predominance.** These common issues predominate over individualized inquiries in this action because Hyatt's liability can be established as to all members of the Classes as discussed herein.

94.     **Typicality.** Travelers United brings this action on behalf of Classes of consumers for whom it advocates in connection with its mission to improve and enhance travel, including through initiatives to oppose hidden hotel fees. Hence, its mission is to promote the objectives of the Classes of consumers it seeks to represent. Travelers United's claims are also typical, if not identical, to the claims that could be asserted by all members of the Classes. Their claims all arise from Hyatt's deceptive Junk Fee practices applicable to all such Class members and are based on the same legal theory as to how and why those practices violate the CPPA. *See Nat'l Veterans Legal Servs. Program v. United States*, 235 F. Supp. 3d 32, 40 (D.D.C. 2017) ("typicality focuses on the similarities between the class representative's claims and those of the class").

95.     **Adequacy.** The CPPA provides that Travelers United, as a public interest organization, can bring this action on behalf of the interests of a class of consumers. *See* D.C. Code § 28–3905(k)(1)(D)(i). In doing so, Travelers United will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex litigation and class actions. Travelers United's claims are representative of the claims of the members of the Classes, as its claims arise from the allegation that each member of the Classes lost money by paying Junk Fees to Hyatt because of Hyatt's unlawful practices. Travelers United also has no interests antagonistic to those of the Classes, and Hyatt has no defenses unique to Travelers United. Travelers United and their counsel are committed to vigorously prosecuting this

action on behalf of the Classes and have the financial resources to do so. Neither Travelers United nor their counsel have any interest adverse to the Classes.

96.    **Superiority.** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that it will provide a realistic means for members of the Classes to recover damages; the damages suffered by members of the Classes may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Classes may be unaware that they have legal recourse for the conduct alleged herein; and because issues common to members of the Classes can be effectively managed in a single proceeding. Travelers United knows of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

97.    Travelers United reserves the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

## COUNT 1
### Violation of the Consumer Protection Procedures Act, D.C. Code §§ 28-3901 *et seq.* On Behalf of the Classes

98.    The allegations of Paragraphs 1 through 97 are re-alleged as if fully set forth herein.

99.    The D.C. Consumer Protection Procedures Act is a remedial statute that is to be broadly construed. It establishes "an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia." D.C. Code § 28–3901(c).

100.    Travelers United has standing to bring this Count under D.C. Code § 28–3905(k)(l)(D)(i), which provides in relevant part that "a public interest organization may, on behalf of the interests of a consumer or a class of consumers, bring an action seeking relief from the use by any person of a trade practice in violation of a law of the District if the consumer or class could bring an action under subparagraph (A) of this paragraph for relief from such use by such person of such trade practice."

101.    Travelers United is a public interest organization that has done significant advocacy work against Junk Fees across the travel industry, both locally in the District and at the federal level.

102.    The CPPA prohibits unlawful trade practices in connection with the offer, sale, advertisement, and supply of consumer goods and services. D.C. Code § 28–3904.

103.    The hotel rooms Hyatt offered to consumers were leased or sold for personal, household, or family purposes and, therefore, are consumer goods or services.

104.    Hyatt, in the ordinary course of business, offers to lease, sell, or supply consumer goods and services and, therefore, is a merchant. D.C. Code § 28–3901(a)(3).

105.    Hyatt's advertising of prices and room rates for lodging in their hotels that do not include daily mandatory Junk Fees that were then charged constitutes an advertisement or offer without the intent to sell the lodging as advertised, which is an unlawful trade practice that violates the CPPA, D.C. Code § 28–3904(h).

106.    Because cost is a material fact to consumers deciding whether to book a hotel room, and because drip and partitioned pricing misrepresent the price of a hotel room and total cost to the consumer, through drip and/or partitioned pricing and representation of Junk Fees as a mandatory government charge, Hyatt engaged in unfair and/or deceptive trade practices by "misrepresent[ing] . . . a material fact which has a tendency to mislead," D.C. Code § 28–3904(e), "fail[ing] to state a material fact" and "such failure tends to mislead," D.C. Code § 28–3904(f), "us[ing] innuendo or ambiguity as to a material fact, which has a tendency to mislead," D.C. Code § 28–3904(f-1), and/or "mak[ing] false or misleading representations of fact concerning . . . the price in comparison to price of competitors or one's own price at a past or future time," D.C. Code § 28–3904(j).

107.    Hyatt's deceptive Junk Fee practices violated each Class member's individual statutory right to truthful information from Hyatt about the actual nightly rate for hotels rooms purchased, leased, or received in the District of Columbia.

23

108.    Class members suffered actual injuries as a result of Hyatt's unfair and deceptive practices in the amount of the mandatory Junk Fees which were not included in the advertised price but were paid.

109.    Each night that Hyatt charged Junk Fees constitutes a violation of the CPPA.

110.    Given these practices, Travelers United and the Class members are also entitled to injunctive relief. D.C. Code § 28–3905(k)(2)(D).

111.    WHEREFORE, Travelers United respectfully requests this Court enter judgment in its favor and the favor of the Classes and against Hyatt, as follows:

a.    Permanently enjoin Hyatt, pursuant to D.C. Code § 28–3905(k)(2)(D), from advertising rates for hotel rooms that exclude mandatory resort, destination, and/or other similar fees;

b.    Permanently enjoin Hyatt, pursuant to D.C. Code § 28–3905(k)(2)(D), from partitioning advertised hotel room prices from mandatory resort, destination, and/or other similar fees, including discontinuing the practice of placing these mandatory fees under a "Taxes & Fees" heading at checkout;

c.    Award the Class members actual damages;

d.    Award the Class members treble damages of the actual damages as provided in the CPPA, or statutory damages of $1,500.00 per violation, whichever is greater;

e.    Award Travelers United and the Class members punitive damages as determined by the trier of fact as Hyatt's actions were replete with malice and were accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, and willful disregard of the Class members' rights as described above;

f.    Award Travelers United and the Class members reasonable attorneys' fees and costs as provided in the CPPA;

24

g.    Grant any additional relief as may be necessary to restore to the Class members money which may have been acquired by means of Hyatt's unlawful trade practices pursuant to D.C. Code 28–3905(k)(2)(E); and

h.    Grant Travelers United and the Class members other and further relief as the Court finds necessary and proper.

## **JURY DEMAND**

112.    Travelers United demands a trial by jury.

Date: August 17, 2023

*/s/ Peter Silva*

Peter Silva (DC Bar No. 1010483)
Hassan Zavareei (DC Bar No. 456161)
Leora Friedman (DC Bar No. 1735514)
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue, NW, Suite 1010
Washington, District of Columbia 20006
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
*psilva@tzlegal.com*
*lfriedman@tzlegal.com*

Wesley M. Griffith (*pro hac vice to be filed*)
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808
Facsimile: (202) 973-0950
*wgriffith@tzlegal.com*

*Counsel for Travelers United and the Putative Classes*